UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>MARK HAUSER,<br><br>        Defendant. | Case No. 1:20-CR-10166-DPW |

## DEFENSE MEMORANDUM REGARDING SENTENCING

Leave to File Under Seal Portions of Sentencing Memorandum and Certain
Exhibits and Leave to File Excess Pages of Sentencing Memorandum
Granted May 13, 2021 [Dkt. No. 38]

## I.  INTRODUCTION

Mark Hauser takes full responsibility for his actions. He took full
responsibility when he entered into a plea agreement prior to being formally
charged. He took full responsibility when he pleaded guilty. He takes full
responsibility as he stands before the Court at sentencing. Exhibit A (Letter of
Mark Hauser). And, as a defendant in a high-profile series of prosecutions, he will
spend the rest of his life accepting responsibility for his actions. He will forever be
known as a "Varsity Blues" defendant.

Mr. Hauser is not looking for pity or sympathy. Rather, he seeks to give full
context to what can only be described as aberrant conduct – an isolated event in the
life of a loving husband and father, an employer of hundreds of individuals, an
investor in new and innovative businesses, a supporter of numerous charities, a

mentor to young men and women and a valued member of his faith community. Mr. Hauser's lifetime of good works, rather than a single poor decision, is what truly defines him.

This poor decision that led him to this place did not occur in a vacuum. His youngest child, Kathryn (Katie), who has struggled mightily with serious medical issues from birth, struggled academically as well, largely as a result of her medical issues. Mr. Hauser's anguish – and his desire to see his daughter successfully overcome her difficulties – led to his participation in a plan that produced a false standardized (ACT) test result. This false result was produced without the participation or knowledge of his daughter.

Although Mr. Hauser participated in the plan, he in no way was its prime mover or mastermind. That role fell to William "Rick" Singer, who had previously provided legitimate tutoring and college counseling to the three older Hauser children for years. Unbeknownst to Mr. Hauser, Mr. Singer had long orchestrated a number of wide-ranging and brazen schemes with other families designed to manipulate the college admissions process. The struggles evidenced by Mr. Hauser's youngest daughter presented yet another opportunity for Mr. Singer to ply his wares. Regretfully, in a time of weakness, Mr. Hauser agreed to participate in Mr. Singer's proposed scheme to manipulate Katie's ACT score to increase her chances of acceptance to college.

Mr. Hauser's history stands in stark contrast to the crime which brings him to this Court. He is a loving husband and proud father of four children, and has worked hard to instill in them the values of faith, concern for others, and hard work. Despite the long hours that he devoted to his businesses and employees, he made it a point to eat dinner with his family daily, say goodnight prayers with his children, and be ever present in the lives of those he loves.

Mr. Hauser is a lifelong entrepreneur, beginning with the blacktopping company he started as a teenager, to buying a small insurance company and growing it into a national powerhouse, to building and managing a private equity firm dedicated to providing value to its investors.

In one respect, this matter presents a real and lasting opportunity for the community to benefit from Mr. Hauser's skills. Over the course of his career, Mr. Hauser has mentored a great number of students, employees, and others. For this reason, about three months ago, Mr. Hauser reached out to Cincinnati State Technical and Community College and began working with the College's president, Dr. Monica Posey, to identify the most effective and impactful ways to work with students there. Exh. B (Letter of Monica Posey, Ed.D.).

Mr. Hauser submits that, when all the relevant factors are considered, a noncustodial sentence would be sufficient to achieve the purposes of punishment for this first-time offender. The aims of punishment have been served: he has paid – and will continue to pay – a dear price, both personally and professionally, as a result of his participation in Mr. Singer's scheme. He is remorseful for his actions and is determined to use them as teachable moments for the rest of his life.

## II.  THE OFFENSE CONDUCT

The facts of Mr. Hauser's offense are undisputed. Mark Hauser paid Rick Singer $40,000 to produce a desired standardized test score on behalf of Mr. Hauser's youngest child. To that end, Mr. Singer arranged for Mr. Hauser and his daughter to travel to a testing center in Houston, Texas, where Mr. Singer's confederates arranged for the test to be rescored after Mr. Hauser's daughter completed the test. PSR ¶ 41. Mr. Hauser did not directly pay the other individuals, nor did he have any insight as to the mechanics of the plan; Mr. Singer facilitated

all the payments and made all arrangements. PSR ¶¶ 41-44. Mr. Hauser's daughter had no knowledge of the plan. PSR ¶ 43.

Although Mr. Hauser forthrightly acknowledges his role in the offense, additional critical details provide a great deal of context for the offense conduct, amply demonstrating its aberrant nature.

Mr. Hauser did not seek out Mr. Singer's assistance to facilitate the crime. In fact, the evidence is to the contrary. Since meeting the Hauser family in 2009, Mr. Singer and his employees provided legitimate tutoring and college counseling services to the Hauser children for a number of years. It was clear that Mr. Singer was an experienced college advisor, offering guidance with tutors, testing preparations, and coaching. Like other college counselors, Mr. Singer had connections with college admissions officials throughout the country. He was an expert in the college admissions process.

Like many other parents, Mark and Margie Hauser hired Mr. Singer and his staff to help their children navigate the college admissions process. The instant misconduct occurred seven years after the family initially met Mr. Singer. It was at that time – after years of working with the family – that Mr. Singer proposed his plan.



Mark and Margie Hauser have sought treatment and care for their daughter from the top medical specialists throughout the country for nearly 20 years. They have experienced a great deal of anguish and pain of their own over the years, watching their daughter struggle and suffer – sometimes seemingly without end – throughout her life.

Not surprisingly, given her constant pain and anxiety, Katie Hauser's academics suffered. She presented challenges that her able-bodied siblings did not. Just as he has done throughout his daughter's short life, Mr. Hauser anguished and fretted about her future. He was determined to put his children on the best footing possible as they entered adulthood – but Katie Hauser's illnesses continued to throw curveballs.

Enter Mr. Singer, problem solver. Mr. Singer, always looking for ways to ingratiate himself with his clients. Mr. Singer, he had a solution. He would arrange for Katie's ACT test to be rescored as necessary to ensure the difficulties she had sitting through a lengthy standardized test would not disqualify her as a college applicant with a solid grade point average.

 In a moment of weakness, and without thinking of the consequences, Mr. Hauser allowed Mr. Singer to put the plan in place.

It is abundantly clear this perfect storm – the combination of a parent's grief and a malevolent and opportunistic con man – forms the backdrop of this case. As such, Mr. Hauser's conduct here is, by definition, aberrant. It was committed without significant planning. It was of limited duration. And most importantly, it "represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20; *United States v. Germosen*, 473 F. Supp. 2d 221, 230 (D. Mass. 2007) (Gertner, J.) ("[The crime] plainly represented a marked deviation by the defendant from an otherwise law abiding life; there was no violence. The

defendant's record was wholly free of any criminal offenses. And when he was apprehended, his cooperation with the authorities reflected just what his prior life had been like – constructive, cooperative and law abiding."); *United States v. Langille*, 324 F. Supp. 2d 38, 43 (D. Me. 2004) (Woodcock, J.) (aberrant conduct departure found where offense conduct represented "such a marked deviation from his prior life that it has all the characteristics of the foolish and thoughtless act of a man pushed over the brink."); *see also United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir. 1996) (holding that an aberrant behavior departure is "available to first offenders whose course of criminal conduct involves more than one criminal act.").

Mr. Hauser is sixty years old. PSR ¶ 85. As the many individuals who submitted letters on Mr. Hauser's behalf can attest, Mr. Hauser has lived an exemplary life. He is a loving husband and father. His business endeavors have provided good, stable jobs for hundreds of individuals and their families. His charitable works are legion. Notably, although Mr. Hauser had known and worked with Mr. Singer for a number of years, the offense conduct occurred in the context of a parent's agony over his child's challenges. Although Mr. Hauser is not a victim, it is equally fair to say that he was preyed upon by Mr. Singer. For Mr. Singer, the situation presented an opportunity – an opportunity that he was only too happy to exploit. Although Mr. Singer's actions do not excuse Mr. Hauser's regretful decision to follow his lead, they speak clearly and loudly to the aberrant nature of the offense conduct.

### III.  MR. HAUSER'S LOVE AND CARE FOR HIS FAMILY

Mr. Hauser was born to Arthur and Joan Hauser on October 4, 1960. He was the fourth of six children of that union – and was the second son. PSR ¶¶ 85-86. Mr. Hauser was not born with a silver spoon in his mouth: his upbringing was solidly middle class. PSR ¶ 86. His father, a football player turned insurance salesman, and his mother, a homemaker, were not particularly focused on providing guidance and a nurturing home to their brood. As Mr. Hauser's sister, Maureen Hauser Heidenreich, explains, their father was "consumed with starting his own business, while their mother had "her hands full," the combination of which "resulted in an obvious lack of attention to parenting." Exh. E (Letter of Maureen Hauser Heidenreich). Mr. Hauser's parents often fought and loudly squabbled. PSR ¶ 86. As the second son, Mr. Hauser played second fiddle to his older brother, whom his parents idolized:

> Mark grew up in the shadow of his older, first born brother whom our hypnotically mesmerized parents referred to as "King Boy." Despite showing obvious effects of this underdog status, like not speaking until the age of four, he persevered.

*Id.* Despite his seemingly second-class status in his own nuclear family, Mr. Hauser responded with grace and grit. As his sister notes,

> His response to any inequity was to overcome the unevenness of the situation by hurdling all obstacles. As a child he ditched disdain, embraced forgiveness, and managed to make a best friend of 'King Boy.' He overcame his *persona non grata* pigeonhole with quiet determination and a skill set that informed all he did in life.

*Id.*

This quiet determination drove Mr. Hauser's desire to enter into a relationship characterized by love and respect – a marked change from the environment in which he grew up.

In 1988, when Mr. Hauser was 28 years old, he was introduced to Marjorie "Margie" Wright, and it was off to the races. In Mr. Hauser's words, it was "love at first sight." PSR ¶ 95. Regardless, as a person of deep faith, he sought counsel from the church because that Margie had previously been married. As Mrs. Hauser recalls, "Mark set up a meeting with a priest that was a family friend to make sure it was ok that we were seeing each other. It was important to him that we were doing the right thing by the Church." Exh. F (Letter of Margie Hauser). The priest blessed the union, and presided at their wedding in 1991, three years after their introduction. PSR ¶ 95.

As the young couple prepared to have a family, the determination that would be a hallmark of Mr. Hauser's life was on full display. Margie Hauser recalls the impact that Mr. Hauser's own upbringing continued to have on him:

> Mark's father was emotionally absent during his childhood. He was one of six children and while his father called his older brother 'king boy,' Mark was shoved to the side to fight his own fights. Mark never held it against his father but made the decision early to be a different kind of father to his own children.

Exh. F. And Mr. Hauser amply demonstrated determination to provide a loving and safe home for his children through his actions:

> Mark was the father who changed the diapers when they were babies and in the next stages of their lives he went deep when it was hard no matter how tired he was. He has been a father that is engaged and encouraging. A father that is physically and emotionally loving and connected to his kids in everything they were and are passionate about. A father who has been a beautiful example of a good husband. A father who has been a father to their friends who were often a part of our family fabric. A father who had high expectations of himself and for those around him. A father who still insists that his kids are not entitled and that they give back.

*Id.*

Melissa, Eric, Nicole, and Katie Hauser were born in quick succession over the course of six years. Their words stand as a testament to the kind of father Mr. Hauser has been – and continues to be – to his children. Mr. and Mrs. Hauser have

worked mightily to give their children that which they most need – roots and wings.

Melissa Hauser, the eldest child, explains the closeness that she has always felt with her father:

> Throughout his childhood, my father experienced difficulty connecting with his own father. I know he made up his mind at a young age that he would raise his children with much more attention, effort, grace, and especially love. He was an incredibly hands-on and actively involved parent in my early years; he coached dozens of kids' sports teams, constantly played board games with us, read us bedtime stories, and made up his own, even sang and danced songs with us.

Exh. G (Letter of Melissa Hauser).

Eric Hauser, the second eldest of the Hauser brood, also speaks to the idyllic childhood provided by his parents:

> We all went to the same Catholic grade school and lived in a suburban Cincinnati neighborhood. Things were simple for me in Ohio – I wanted to play sports and spend time with friends.
>
> There was beauty in this simplicity that I didn't fully realize for many years until I started living on my own. . . . We had structure, there was discipline, and those Midwestern values have been at my core from a young age.
>
> The simplicity I mentioned looking easy – wasn't. My father was . . . running a family insurance business and working as a merchant banker, aside from several major entrepreneurial pursuits undertaken before he was thirty years old.

Exh. H (Letter of Eric Hauser).

Despite his father's hectic schedule, Eric says his parental devotion was remarkable, as he never missed a game or a football or basketball practice. Mark was the head coach for many of the teams for nine years:

> He never missed a phone call. He never missed a birthday, a graduation, even a conversation. It was anything but simple, and I cannot imagine holding even myself to that standard as a father one day.

*Id.* Their religious connection was so normal that when Eric got a cell phone in eighth grade, he started to call his father on the road so his father could guide the

teenager through his nightly prayers. The teenager continued such calls each night for six years, even after he left for college. Eric recalls:

> Later in life, I would hear stories from his business partners and best friends of the meetings and dinners he stepped out of, sometimes mid-sentence, to pick up the phone and pray with me, unapologetically returning a few minutes later.

*Id.*

Nicole Hauser, the third of four Hauser children, writes of the support and love her father gave her throughout her young life:

> My earliest memory of this was back in middle school. Struggling over math homework, my tears streaked the pages and I wanted to give up and go to bed. My dad sat with me at the kitchen table teaching me multiplication tables for hours. He let me know that this was life, that pushing through hard things would be the only way to make me a better, stronger person.
>
> In high school, I ran for class vice president. My dad helped make the campaign posters and looked over the speech I wrote. When I lost, he came to school to take down the posters with me. I remember walking with him as we did that, upset, wondering out loud whether I should even try next year. I already knew what he was going to say before he said it: that I should absolutely run again. He said failure is a constant in life, and bouncing back is a sign of growth and determination. It's why I showed up and became class president my junior and senior years.

Exh. I (Letter of Nicole Hauser).

And Katie Hauser, the youngest Hauser child, recalls well the love and care that her father has provided throughout her often difficult life:

> At the age of four, I was diagnosed with ███████████████ ████████████████████████ The disease, while traumatizing and difficult on my family, built a foundation of respect and love that I have for my dad. From that young age, I was able [to] experience the great lengths my dad would go to for those he loves. While I was in a full-body cast, he always made sure to keep a smile on my face. He made sure I could ride along during a water-ski trip in Michigan, helped me play outside with my siblings so I didn't have to be strapped on a swing, and surprised me every day in the hospital with my favorite mud pie dessert. My dad has always been my number one supporter.

Exh. J (Letter of Kathryn Hauser). Katie's physical ailments took on an emotional component during her teenage years, and her father did his best to provide support on this front as well:

> The pain and discomfort that this has brought into my life has been damaging and, at many times debilitating. After I left for college, I truly realized that my dad has never wavered in his support for me. He is the hardest working person I know, and it wouldn't take him a second to put anything above his care for me. He has stepped out of important meetings, dropped calls, and changed flights, just to name some examples, to come help me when I needed it. I remember my freshman year, I was so homesick, my dad scheduled a whole weekend away from work to come visit me and take me to a football game. We now make this an annual trip for the two of us to have our quality time together, something that brought me up when I was at my lowest.

*Id.*

Simply put, Mr. Hauser's wife and children are the most important thing in his life, and his determination to make sure that his children know that they are loved and supported has borne fruit: all are educated, contributing members of society and aim to carry out the core values that their parents instilled in them: honesty, integrity, faith, and the Jesuit maxim of being men and women for others. Indeed, those who know the Hauser family speak to the roots and wings that Mr. and Mrs. Hauser have provided to their children. Exh. K (Letter of Susan Zaunbrecher); Exh. L (Letter of Paul Swanson); Exh. M (Letter of Phil Riola); Exh. N (Letter of Susan Bubenhofer); Exh. O (Letter of Carolyn Wright); Exh. P (Letter of Michael Callahan); Exh. Q (Letter of Robert D. Carl, III); Exh. R (Letter of Phil D. Collins); Exh. S (Letter of D. Andrew Spalding); Exh. II (Letter of Megan Adamson); Exh. KK (Letter of Margaret Callahan); Exh. LL (Letter of Lela Collins); Exh. QQ (Letter of Shannon Hammond); Exh. RR (Letter of Julie Hill); Exh. ZZ (Letter of Kris Moran); Exh. AAA (Letter of Tom Nies); Exh. FFF (Letter of Diane Ryan); Exh. GGG (Letter of Jari Smith); Exh. HHH (Letter of Jan

Spalding); Exh. KKK (Letter of David Tetrick); Exh. OOO (Letter of Beth Wright).

And it is this demonstrated care and concern for his children – particularly his youngest daughter, Katie – which is at the root of the offense conduct. The anguish of having watched his baby daughter continually battle her ailments made him an appealing target for an operator such as Mr. Singer. As Mr. Hauser readily acknowledges, there is no excuse for his conduct. He allowed his moral compass, which he had spent a lifetime carefully calibrating, to go askew. And although there have been significant and disproportionate financial costs associated with his actions, to say nothing of the potential loss of his liberty, those consequences pale in comparison to the painful conversations he has had about the offense conduct with his wife and children – especially young Katie. Mr. Hauser is keenly aware that he has failed to live up to the values of honesty and integrity – values that he has worked so hard to instill in his children. But in accepting responsibility for his mistake, he has worked to instill yet another value: the humility to acknowledge one's transgressions and ask for forgiveness.

## IV.  MR. HAUSER'S ENTREPRENEURSHIP AND BUSINESS LEADERSHIP

The role that Mr. Hauser plays in the life of children is even more notable given the fact that, until recently, he ran two companies: Hauser Insurance and Hauser Private Equity. Heading either of these companies would be a full-time position, but Mark Hauser managed to do both – and still play a significant role in his family's life. But Mr. Hauser has plenty of experience in running a company – something he has done since he was fifteen years old, when he launched his first business, Hauser Blacktopping.

Mr. Hauser talked his friend Alan Wagner, who was a year older, into joining him in the venture. Mr. Wagner's greatest appeal at the start was that he was 16 years old and had a driver's license. They obtained a vehicle that sister Maureen describes as "a beaten up horror of a truck" and began going door-to-door and cold-calling people to see if they needed their driveways blacktopped or sealed. Exh. E.

The blacktopping work was backbreaking, and they risked chemical burns by laying the blacktop under Cincinnati's blazing summer sun. As Maureen recalls: "For eight years, his summer beach was the physically brutal application of blacktop on the unrelenting (Cincinnati) heat." *Id.* She sees that time blacktopping by day and other work, such as unloading trucks on nights and weekends, as defining who her brother became. She observes that, "By age fifteen his lifelong pattern of working harder than everyone else was established." *Id.*

It all nearly ended abruptly, however. His partner Alan Wagner, who has known Mr. Hauser for 54 years, recalls a time in their blacktopping business when his life was in his friend's hands as the younger boy drove their ramshackle truck:

> I was in the front passenger seat, and I noticed Mark starting to pump the brakes as we were going down the hill, but nothing was happening, and I said, 'What's going on?' And he said, 'The brakes aren't working!' We both knew this wasn't good as at the bottom of the hill there was a pretty major intersection, the light was red, and cars were traveling the other way through the intersection, so there could be a major collision. We only had a few seconds to react, and Mark told me to jump out of the car to save myself, which I hesitated to do, and he then yelled at me and said, 'Get out,' so I did. I then started running down the hill, watching as the truck approached the intersection, worrying about an accident with another vehicle, and wondering if Mark would jump out too in order to save himself.

> Instead, at the last second, Mark veered off the road, cutting through the front yard of a local business on the corner, which was full of many large trees. The truck went up on two wheels, narrowly missing a few trees, one by inches, and finally came to a stop.

Exh. T (Letter of Alan Wagner). Mr. Wagner ran to the vehicle where he says he found Mr. Hauser, his hands still clenched around the steering wheel, "white as a ghost," and he asked, "Are you ok?" Mr. Hauser couldn't speak. Mr. Wagner relates:

> I think he was in a state of shock. Finally, he did, and he said, 'I thought I was going to die, but I didn't want to kill anybody else!'

*Id.*

That brush with death didn't deter Mr. Hauser on the business front. Hauser Blacktopping was Mr. Hauser's first successful business. He continued to run the company while attending college at Miami University, ultimately handing the company off to his brother.

After graduating from Miami with a degree in finance, Mr. Hauser joined an investment banking firm in Cincinnati, where he achieved a great deal of success. Exh. U (Letter of George S. Vincent). He later joined his father's insurance agency, which was a small local firm. *Id.* Mr. Hauser built that small business into a much bigger venture, but ran head on into his father, the former professional football player:

> After a series of disagreements about company policy and the future of the Company, Mark's dad fired Mark. In the wake of his firing, every employee in the Company, with the exception of Mark's youngest sister, notified Mark's dad that they would be joining Mark in a new venture. At this point, Mark's dad made the decision to sell the Company to Mark, but at a number two and half times that which had originally been discussed.

*Id.* As Mr. Hauser's longtime attorney, George Vincent, recalls, "Witnessing this, I urged Mark to pursue an independent insurance career, outside of the family business." *Id.*

Instead of complaining, Mr. Hauser purchased the company at his father's asking price. Mr. Hauser formally became the new owner, only to discover a surprise. As his attorney recounts:

> The purchase contract provided that all assets of the Company on the day of closing would remain in the Company. The day after the closing, Mark arrived at the office, having been locked out until that day, to discover that all of the cash had been taken by his dad, as well as all supplies, including paper clips, paper, pens, and pencils, [and] even the soft drinks in the soda machine had been taken by his father in violation of his agreement.

*Id.* Mr. Hauser soldiered on: he quintupled the company's size over the course of the next 25 years, transforming it into a national risk-management and benefits brokerage. *Id.* Prior to the commencement of the instant case, the company employed 100 employees and had annual gross sales of $20 million. PSR ¶ 115. The Hauser Group, as the company is now known, has a national footprint, headquartered in Cincinnati and with offices in Atlanta, Chicago, St. Louis, Los Angeles, and Kansas City.

Despite his success in the insurance industry, Mr. Hauser continued to feel the entrepreneurial itch. In 2008, he founded Hauser Private Equity, a hybrid private equity fund manager with direct investments in more than 20 privately owned companies and over 40 private equity funds. The fund has hundreds of active and completed investments to its name. In 2013, Hauser Private Equity closed on its first $100 million fund. Today, Hauser Private Equity has offices in Cincinnati, Los Angeles, and Washington, D.C.

Mr. Hauser's leadership, honesty, and desire to create a positive corporate culture – as well as to provide value to his clients – is evident to those who know him well. As R. Kerry Clark, a retired business executive and a director of Anthem, General Mills and Textron, notes:

> I believe Mark tries to do the right thing in business. I learned of a previous real estate investment that he pulled out of because he felt the other partners were not being forthright with their investors. As a partner today, I find that Mark has a very strong sense of stewardship of his investors' money. And, he has a deep respect for his partners, frequently seeking their advice and input.

Exh. V (Letter of R. Kerry Clark).

Similarly, Dr. William Barrett, the co-director of the University of Cincinnati Cancer Center, and whose friendship with Mark Hauser has spanned 40 years, states:

> Mark . . . has consistently used his talents for the betterment of others. . . . He has tried to make the world a better place by helping and supporting people close to him as well as society at large. His businesses have employed many people who are grateful for the opportunity to be part of important and good work. He has created an environment of collegiality, respect, effectiveness, and success. His business interests have benefitted many individuals, families, and companies. He has been a powerful driver of opportunity for many, and his impact has been substantial.

Exh. W (Letter of William Barrett, M.D.)

George Vincent, Mr. Hauser's attorney for more than 25 years, has seen Mr. Hauser consistently demonstrate his commitment to his company, his clients, and his employees:

> I serve on Mark's Board of Directors, so I have had the chance to watch him interact with nearly all of his employees. Mark is a servant leader and leads by example. He continues to be one of the hardest working people in the Company. Further, the Company (with nearly 100 employees) is marked by exceptional longevity. Many employees have worked with Mark for over 20 years, which is evidence of the culture Mark has created, as well as the value and quality of the benefits that Mark provides to his employees, which, in my experience, are above market.

Exh. U.

But Mr. Hauser's care and commitment are not just apparent to those who work *with* him – just as important, it is readily apparent to those who work *for* him. Steve Feine, an employee of nearly 20 years, recalls the kindness that Mr. Hauser showed to him and many members of the Hauser corporate family:

> [Mark] was there for me and my family when I was searching for employment back in 2002 after being let go from a national insurance carrier. Making the transition from an Insurance Carrier to an Insurance Broker can be overwhelming. Mark took a risk in me and provided the thoughtful leadership and mentoring to make the transition as smooth as possible. . . . His unwavering tenacity to grow a local insurance agency into a national insurance broker was not without personal sacrifices and defeats. His Hauser employee family is grateful to his

grit and determination to succeed. The personal sacrifices he made throughout the years has provided an opportunity for his employees to raise their own families.

Exh. X (Letter of Steve Feine).

Mr. Hauser's interpretation of his faith is crucial to the way he treats his employees, whether in the workplace or in the Hauser home. Sue Bubenhofer, who has been employed as the family's housekeeper since 1985, offers these comments in a letter to the Court:

> The Hauser family has always treated me like one of their family. They showed their concern when I became ill with a heart problem and Mark was calling me to see how I was doing. He did not act like my employer but a dear friend who was worried about me.

Exh. N.

Sandra Anderson, Hauser's director of human resources, states that Mr. Hauser's help was instrumental in helping to evacuate an employee's children from Puerto Rico after Hurricane Maria decimated the island. Exh. Y (Letter of Sandra Anderson). Ms. Anderson also tells of how her life was personally and directly affected by Mr. Hauser's willingness to go the extra mile for his colleagues:

> [M]y daughter was diagnosed with breast cancer at age 38. This was a tremendous blow for someone who had never had medical issues in the past. My daughter also has two very active elementary-school aged children that have many after-school activities. . . . This required me to adjust my work hours. After hearing of my daughter's diagnosis, Mark called me personally and told me to do what I needed to help my daughter and her family. Without the support and understanding from the leaders of Hauser, I could not have been there in support of my daughter. I am relieved to say that she is now a Cancer Survivor. Her diagnosis also changed how Hauser pays for mammography. Not only did Hauser remove the age limit for mammography but Hauser also pays for 3-D mammography. These things were done to support the needs of Mark Hauser's employees and their families.

*Id.*; *see also* Exh. Z (Letter of Debra Pollino); Exh. AA (Letter of Jeff Lukash); Exh. JJ (Letter of Austin Bockwinkel); Exh. OO (Letter of Charles H. Gerhardt, III); Exh. PP (Letter of Joel Guth); Exh. TT (Letter of James Hyer); Exh. UU (Letter of Douglas Kammerer); Exh. VV (Letter of Lori Kellerman); Exh. WW

(Letter of Lawrence Kyte); Exh. YY (Letter of Brian Moran); Exh. CCC (Letter of Scott Robertson); Exh. DDD (Letter of Ryan Rusch); Exh. EEE (Letter of David Ryan); Exh. III (Letter of Mary Tankersley); Exh. JJJ (Letter of Rob Tankersley); Exh. LLL (Letter of Amy Wood); Exh. MMM (Letter of Joe Worrall).

## V.   MR. HAUSER'S GOOD WORKS AND PHILANTHROPY

In addition to giving back to his colleagues and employees, Mr. Hauser believes in giving back to his community. But Mr. Hauser does not just *believe* in being a man for others – he *is* and *has been* a man for others his entire life.

As a teenager, Mr. Hauser cultivated a sense of empathy for people who didn't seem to have anyone stand up for them. In his junior and senior years of high school, Mark founded a mentorship program for those less fortunate. As his sister Maureen recalls,

> During his Junior and Senior years at St. Xavier High School in Cincinnati, Mark founded the Junior Big Brothers Organization. It introduces students to the life-changing concept of mentoring and is ongoing still today! As a young man he could be found volunteer mentoring at what then was named Cincinnati Resident Home for the Mentally Retarded. For two years running he marshaled the largest food drive his school had ever seen. His multiple efforts of outreach earned him the "Atta Boy" award as most community minded student.

Exh. E. It was the beginning of a long-term commitment that evolved into philanthropy once he made it in the business world.

His philanthropic works since that time include the following:

- Springer School and Center (Cincinnati, Ohio)

  o Mr. Hauser served on the board of directors of this school for the learning disabled for nine years, and sponsored the construction of a new library.

- Marymount High School (Los Angeles, California)

  o Mr. Hauser served on the board of directors for six years, including four years as chair. He recruited an entire new board of directors and spearheaded the most significant school expansion in the previous 20

years. As finance chair, he helped bring the school from the verge of default to solvency.

- Habitat for Humanity (Cincinnati, Ohio)

    o Mr. Hauser launched an initiative through his insurance company for management and staff to donate their time to this organization. This effort followed Mr. Hauser's work building homes for a predecessor organization.

- Our Lord Christ the King Catholic Church (Cincinnati, Ohio)

    o Mr. Hauser has served as a lector for nearly 20 years and has served as a significant fundraiser for his home parish.

- March of Dimes (national)

    o Mr. Hauser agreed to donate 10% of the gross profits of one of his businesses for approximately ten years, donating more than $5 million to this organization.

- Society of St. Vincent de Paul (Cincinnati, Ohio)

    o Mr. Hauser co-created and funded a free pharmacy program for impoverished and homeless individuals.

- Cincinnati Museum Center (Cincinnati, Ohio)

    o Mr. Hauser served on the board of directors for approximately ten years and served as finance chair for a number of years. In the latter role, his work brought the organization from the brink of insolvency to financial sustainability.

- Envision (f/k/a Home for the Mentally Retarded) (Cincinnati, Ohio)

    o Mr. Hauser has taught and tutored students there for a number of years.

- Griffith Insurance Education Foundation (Malvern, Pennsylvania)

    o Mr. Hauser served on the board of directors of this insurance education nonprofit organization for more than ten years.

- Life Center Organ Donor Network (Cincinnati, Ohio)

    o In response to the death of an employee's son, Mr. Hauser launched a volunteer organ donor initiative through his business.

PSR at 54-55.

In addition, Mr. Hauser and his companies have also served as a financial contributor to the Jewish Federation of Cincinnati, the Navy Seal Foundation, the

Cincinnati Zoo, the United Way, the National Downs Syndrome Foundation, ArtsWave Cincinnati, Lifeline of Ohio, Visionaries & Voices Cincinnati, Clovernook Center for the Blind, Ursuline Academy, First Tee of Miami Valley, Ohio Valley Goodwill, Greenacres Foundation, Talbert House, the Pink Ribbon, United Healthcare Children's Foundation, National Geographic Society, Links Foundation, Pregnancy Center East, and the Leukemia & Lymphoma Society. *See* PSR at 55; Exh. K; Exh. Y; Exh. BB (Letter of Thomas Fiorini).

Although a number of Mr. Hauser's good works have been public, he has performed many more, quietly and without fanfare. For example, he has taken the time to mentor numerous individuals, providing guidance, support, and a helping hand. Exh. SS (Letter of J. Peter Hill, DVM); Exh. XX (Letter of Mitchell McCollum); Exh. BBB (Letter of Alan Powell); Exh. NNN (Letter of Brian Wright).

Charles Washington recalls the years when his son, a classmate of Eric Hauser, was in high school and he was working as a janitor for Lockheed, which was several hours away from the school. Mr. Washington writes of his gratitude to Mr. Hauser for the home that he provided for his son, Charles Washington, IV:

> Mr. Hauser took a [liking] to my son and setup a room at his house for him several times a week to prevent us commuting from Los Angeles to Encino daily for high school. Mark treated my son as if he were his own which was truly unexpected. Had he not opened [to] us his home, I would have had to get up every morning at 4 am to drive my son to Encino and drive back to work in Redondo Beach and make it to work at 6 am. This certainly is out of the norm, and I am not sure how many people would have opened their home to a black kid living in the ghetto with three young daughters. Mark's entire family embraced my son and I as if we were family. Mark would come to the games and cheer just as loud for my son playing football as he would for his own son. Mark made it a point to show my son things that he otherwise would not have experienced, and we are forever grateful to him and his entire family.

Exh. CC (Letter of Charles Washington).

Charles Washington, IV, now a professional football player with the Arizona Cardinals and who remains close friends with Mr. Hauser (whom he affectionately calls his "second dad"), echoes his father's sentiments, describing the love Mr. Hauser has shown him over the years:

> From the first day I was introduced to Mark, I was given constant and authentic life advice, treated like a close friend, and I could always trust that he had my best interest. The reality was he by no means had to, but out of the kindness of his heart he looked past our differences and always wanted to make sure I was doing well and in a position to succeed.
>
> Coming from an under privileged area of south-central Los Angeles, my commute to and from high school wasn't the easiest; I often slept on floors and drove over an hour to make it to school. Seeing how my family and I struggled, Mark opened his door as a place for me to lay my head whenever needed. For a year and a half, I spent about half of my nights at the Hauser's. Because of that, I could get to and from school without giving my parents stress, and they knew I would be looked after and under a good influence. As I look back, that time was what allowed me to turn from a teenager into a young man. While living with Mark and the rest of the Hauser family, I was encouraged [to] go to church and connect with my faith. It became a part of our weekly Sunday routines and had a major impact on my life. While we are all flawed humans, one thing I can proudly say about Mark is that he loves his family, his friends, and all of the people he comes into contact [with] with all of his heart.
>
> I've been fortunate to live out my lifelong dream of making it to the NFL and becoming a professional football player. One of the biggest highlights of my career was being able to travel to Cincinnati for a game and looking up and seeing Mark and the rest of my second family cheering me on from the stands.

Exh. DD (Letter of Charles Washington, IV). *See also* Exh. EE (Letter of Gary Otto); Exh. FF (Letter of James Gould); Exh. GG (Letter of Terry Adamson); Exh. MM (Letter of Maasai Ephriam); Exh. NN (Letter of Nate Gerbus).

Mr. Hauser is truly a man for others and has demonstrated this time and time again throughout his life. These good works are at the core of his character.

## VI.  MR. HAUSER HAS SUFFERED – AND WILL CONTINUE TO SUFFER – SIGNIFICANT AND DISPROPROTIONATE COLLATERAL CONSEQUENCES

Although Mr. Hauser accepted responsibility for his actions and signed a plea agreement on October 21, 2019 (Dkt. No. 4), formal charges were not filed until August 21, 2020 – ten months later. Dkt. No. 1. During this period, Mr. Hauser was negotiating the sale of his insurance company. Brown & Brown, a Florida-based insurance company, had agreed to pay $187 million for the company in the deal, which was scheduled to close at the end of August 2020. PSR ¶ 115. However, after the government announced the plea agreement on August 21, the same day as the sentencing of Varsity Blues defendants Mossimo Giannulli and Lori Loughlin, Brown & Brown pulled out of the deal on account of the publicity generated by the case. PSR ¶ 115. All of the work that Mr. Hauser had performed to consummate the sale of the company that he had essentially built from scratch – which comprised thousands of hours and a significant financial investment in lawyers, consultants, and valuation experts – was for naught. George Vincent, Mr. Hauser's longtime counsel, describes the failed sale and the devastation it wreaked:

> [A]t the time Mark entered into his Plea Agreement with the Government, the Government agreed to give Mark the opportunity to sell the Company before the Plea Agreement was unsealed. Mark worked diligently to do so and entered into an agreement with Brown & Brown ("B&B"), a public company, to sell the Company and protect the jobs of his employees. Because B&B is a public company, it made an announcement of the sale agreement upon its execution, but before the Hart-Scott-Rodino waiting period had expired. After executing the Asset Purchase Agreement with B&B, Mark informed B&B of the Plea Agreement and Mark's counsel informed the U.S. Attorney's office of this. However, several weeks after the announcement and one week before the sale was scheduled to close, the Government unsealed the Plea Agreement. Three days later, Brown & Brown walked away from the deal, citing the negative publicity associated with Mark, Rick Singer, and the Varsity Blues investigation as their reason for walking away.

Exh. U.

"The cost of Mark not closing the sale to B&B was enormous," Mr. Vincent concludes. *Id.*

James Stines, Hauser Group's president, confirms the huge professional and personal cost of the failed sale:

> This current situation has been devastating to Mark, his family, and our organization. He is remorseful, embarrassed, and humiliated by everything that has unfolded. I know Mark is sorry for what this has done to his family and his business. I have watched Mark painfully deal with both the scrutiny and the emotional toll of the situation. The price that Mark has already paid has been enormous. The cancellation of the sale of the business (in excess of $150,000,000) was devastating financially for not just Mark but for me, and all . . . employees of Hauser, Inc. Mark and I spent nearly 12 months preparing the company for sale, the timing was right for many reasons. It was awful and unbelievable that everything could collapse around an entire organization on one afternoon in August. Each employee of Hauser, not just Mark Hauser, was emotionally and financially impacted by the situation and already paid a steep price.

Exh. HH (Letter of James Stines).

These losses will be difficult to recoup because Mr. Hauser has been forced to give up his insurance license following his entry of the guilty plea in this case.

Mr. Hauser's staff has suffered the consequences as well. Mr. Hauser's indefinite, voluntary unpaid leave of absence is "a great hardship on . . . the other employees who rely on him as the Company's CEO." Exh. U. In addition, Hauser Private Equity's reputation will take years to rebuild.

The consequences to his children have been significant as well. Eric Hauser was questioned by his employer, a major investment bank, to determine his knowledge of the scheme. Nicole, an on-air television reporter, has been the subject of anonymous complaints to her station. And Katie, who graduated this month from Ohio State University, has endured negative media attention and harassment in her community. PSR ¶¶ 99-101.

Collateral consequences always flow from a felony conviction. Many of Mr. Hauser's civil rights – such as the right to vote (significant especially for a political

fundraiser), and the right to hold public office – will be adversely impacted by Mr. Hauser's conviction in this case.

However, it is submitted that the atypical and disproportionate consequences that have been, and will continue to be, visited upon Mr. Hauser merit the Court's consideration in fashioning the appropriate sentence. Essentially, they constitute a form of punishment that will continue long after Mr. Hauser has completed any formal sentence imposed by the Court. *See United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (a reduced sentence was not unreasonable in part because of collateral consequences such as regulatory risks and other ongoing losses); *United States v. Scott*, 503 F. Supp. 2d 1097, 1103 (E.D. Wis. 2007) (home detention in lieu of jail time sufficed because "defendant also suffered significant collateral consequences in the probable loss of her []job, which added to the punitiveness of her conviction.").[1]

In addition to all the other factors, it is respectfully submitted that the collateral consequences so clearly and undeniably present here militate against the need to impose a custodial sentence of any length. Mr. Hauser has paid dearly, and he will continue to pay dearly for the remainder of his life.

---

[1] Mr. Hauser also submits that his going forward with a guilty plea despite such devastating, real-world collateral consequences constitutes extraordinary acceptance of responsibility under Section 3E1.1 of the United States Sentencing Guidelines. *See United States v. Martin*, 363 F.3d 25, 49 (1st Cir. 2004) ("An extraordinary acceptance of responsibility, however, requires some action that goes beyond the behavior envisioned by the § 3E1.1 adjustment, moving the case outside the "heartland" of the Guidelines."); *United States v. Brown*, 985 F.2d 478, 481 (9th Cir. 1993) ("The mere existence of section 3E1.1(a) does not preclude the sentencing court from making an additional departure in the case where the defendant manifests an extraordinary acceptance of responsibility."); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) (Where the standard reduction for acceptance of responsibility does not fully account for the true extent and nature of that acceptance, a court "may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction.")

## VII.    A SENTENCE OF PROBATION, COUPLED WITH A ROBUST PROGRAM OF COMMUNITY SERVICE, IS APPROPRIATE IN THIS CASE

Given all of the factors set forth above, Mr. Hauser respectfully submits that a non-custodial sentence is the appropriate one here, both under (1) the factors set forth in 18 U.S.C. § 3553, and (2) the United States Sentencing Guidelines.[2]

The Guidelines themselves make clear that the Court should consider a noncustodial sentence for Mr. Hauser, who is a "nonviolent first offender" under the Guidelines.[3] U.S.S.G. § 5C1.1, comment. n.4. Given the host of severe consequences that have been visited upon Mr. Hauser as a result of this conviction – consequences and infamy that will follow him the rest of his life – the aims of justice are well served through a probationary sentence. Moreover, such a sentence will allow him to continue to serve his community through a robust program of service.

Mr. Hauser's history of community service goes all the way back to high school, when he was a dedicated volunteer with Big Brothers and at a center for the mentally challenged. Over the course of his professional career, he has dedicated himself to providing mentorship and assistance to people in need. In particular, he has been a stabilizing force for underprivileged young athletes from diverse backgrounds, offering them advice on managing money, saving for the future, and making good investments.

Currently, Mr. Hauser is renewing his commitment to mentoring low-income students who have little access to resources and few opportunities to help

---

[2] Mr. Hauser agrees with the Probation Office's application of the Sentencing Guidelines. The proper application of the Guidelines yields a sentencing range of 0-6 months. PSR ¶ 121; *see also* PSR at 40-54.

[3]  The PSR notes that Mr. Hauser had been charged earlier this year with speeding and reckless driving. PSR ¶¶ 3, 82. The reckless driving charge was recently dismissed, and Mr. Hauser admitted to the speeding infraction. In any event, this infraction does not yield any criminal history points under the Guidelines. U.S.S.G. § 4A1.2(c).

them to reach their educational and career goals. For the past three months, Mr. Hauser has been actively working with the president of Cincinnati State Technical and Community College, Dr. Monica Posey, to identify the most effective and impactful ways to work with students there. Mr. Hauser has traveled to the campus to meet with Dr. Posey and faculty members on two occasions, and they have had numerous conversations over Zoom and by phone. Their goal: to set up a framework to provide students access to opportunities, and preparation for making the most of them.

By any definition, the campus is a diverse one. Nearly 40 percent of students are people of color, approximately three-quarters of whom are African-American. More than three in every five students receive federal financial aid. Students include recent high school graduates, and others who were in the working world but are returning to school to upgrade their skills.

The college is open and not selective. Anyone with a high school degree or equivalent can take courses at Cincinnati State, even if they require remedial coursework in reading, writing, or math during their time at the college. The average age of students is 28 years old, and most are the first person in their family to attend college. For these and other reasons, workforce training, the development of specialized skills, and job placement are crucial to the college's vision.

During Mr. Hauser's visits to the 40-acre campus, he focused his attention mostly on the Career Center, according to Dr. Posey. As a result of the pandemic, there were few people on campus, but Mr. Hauser did speak with a professor and queried several students over Zoom. Prodded by Mr. Hauser, students told him of the challenges they face, their goals, and how they hope to achieve them. Mr. Hauser listened and provided feedback, according to the school's president. Dr. Posey reports that Mr. Hauser's work with the students was very constructive.

In addition to his own engagement with students and faculty, Mr. Hauser looks forward to bringing in business leaders who would deliver powerful and pragmatic talks to students, and facilitate internships and work opportunities that can change the course of those young adults' lives. The idea is to help them develop personal contacts, work experience, life skills, and general know-how.

The specific plan will be developed with Mr. Hauser and in collaboration with the college team. Mr. Hauser has been candid with Dr. Posey and members of the faculty and staff about his crime and his desire to make amends.

Dr. Posey has provided the following letter that expresses appreciation for Mr. Hauser's interest in Cincinnati State:

> Thank you for your interest in Cincinnati State Technical and Community College, and how you might provide service to the College. This would be part of a potential court-ordered community service component of your sentence in federal court related to the college admission fraud case.
>
> We appreciate your efforts in recent months to get to know more about the College and our students, including a campus tour, virtual and in-person campus activities, a virtual meeting with a team of faculty and administrators, and a virtual talk to students in a class.
>
> Cincinnati State has served as an engine of economic and social advancement for the Greater Cincinnati region for 50 years. The College leads in academic and workforce training developed in partnership with regional employers, and now has more than 130 degree and certificate programs.
>
> As an open-access institution, we admit students of all academic, social-economic, and demographic backgrounds. Low tuition rates make education accessible to all. Many students take advantage of the lower costs and 45% of our graduates continue their education through transfer agreements developed with over 20 different four-year institutions.
>
> In addition to serving as a leader in education and technical training, Cincinnati State plays a key role in the local economy. We are estimated to add over $600 million annually to Greater Cincinnati. The College is a large employer for the region and 85% of our students stay in the area after graduation to work and live in the community, which is one percentage point higher than all of the top regional four-year universities.

Our major goal is to increase student success, which includes retention, graduation, and employment. Relationships with business and community leaders help us achieve this goal.

The College is open to further discussing a community service placement that would take into account the sentencing objectives of the court; the needs of the college, our students, and the community; and how your abilities and experience might help meet those needs.

Based on my meetings with you and several College employees, we recognize that you may be able to help in several ways:

- Provide career services support for current students and graduates;

- Help increase graduate employment opportunities through connections with individuals and networks that the community college student does not typically have access to;

- Sharing your experience and knowledge in various fields of business.

The specific plan will be developed with you and in collaboration with the college team.

We appreciate that you have been candid with us about your participation in the College Admissions case and your desire to make amends.

Your expertise and networks could be beneficial to our students who are not privileged to have this type of access. Supporting some of our low-income students and those in our community who are less fortunate could help as you seek to repay your debt to society.

Our objective would be for any community service placement to be purposeful, appropriate, readily documented, and aligned with court requirements.

Exh. B.

Mr. Hauser is requesting that he be allowed to perform community service at Cincinnati State for as many hours as the Court deems appropriate.

Although the Court has a great deal of discretion to determine an appropriate sentence for Mr. Hauser, the law makes clear that a noncustodial sentence, coupled with a significant community service program, is an appropriate one in precisely this type of case. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (Non-custodial sentence for mail fraud substantively reasonable despite an 87-

month variance. As the trial judge noted, "Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed.").

## VIII.   CONCLUSION

For all those reasons stated above, Mr. Hauser respectfully submits that a probationary sentence, coupled with the community service program described herein, is sufficient, but not greater than necessary, to achieve the aims of sentencing for this first-time offender. The requested sentence is the appropriate one here, given Mr. Hauser's lifetime of leadership, good works, and love for his family. It accounts for the significant and disproportionate collateral consequences that his conviction visits upon him. And it ensures that he continues to give back to his community, under the watchful eye of the Court.

Respectfully submitted,

MARK HAUSER

By his counsel,

*/s/ Mark E. Beck*
Mark E. Beck (*pro hac vice*)
John Hanusz (*pro hac vice*)
BECK LAW, PC
350 West Colorado Boulevard, Suite 200
Pasadena, California 91105
213-596-7828
mbeck@markbecklaw.com
jhanusz@markbecklaw.com

Robert Fisher (BBO No. 652602)
NIXON PEABODY LLP
53 State Street
Boston, Massachusetts 02109
617-345-1000
rfisher@nixonpeabody.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served by ECF on counsel for the Government on May 20, 2021. The redacted portions of the document (along with the corresponding exhibits) were served by electronic mail on the same date.

*/s/ Mark E. Beck*
Mark E. Beck